IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL CIRCUIT
ST. CLAIR COUNTY, ILLINOIS

DALBIR SAHDEV,                                )
                                              )
        Plaintiff,                            )
                                              )
                                              )        No.   09-L  0557
vs.                                           )
                                              )
EMPIRE COMFORT SYSTEMS, INC.,                 )
BRIAN H. BAUER,                               )
PAMELA A. BAUER,                              )
EMPIRE GROUP, INC.,                           )
AMERICAN HEARTH SYSTEMS, INC.,                )
EMPIRE PROPERTIES, INC.,                      )
HEARTHRITE, INC.  and                         )
SKYPARK AIRPORT PARKING, LLC,                 )
                                              )
        Defendants.                           )

*FILED*
ST. CLAIR COUNTY
OCT 1 6 2009
*Circuit Clerk*

## COMPLAINT

Comes now Plaintiff, Dalbir Sahdev, by and through his attorney, Ferne P. Wolf of

Sowers & Wolf, LLC, and for his complaint against Empire Comfort Systems, Inc., Brian H.

Bauer, Pamela A. Bauer, Empire Group, Inc., American Hearth Systems, Inc., Empire Properties,

Inc., HearthRite, Inc. and Skypark Airport Parking, LLC, states as follows:

### IDENTITY OF PARTIES AND STATEMENT OF FACTS COMMON TO ALL COUNTS

1.      Plaintiff Dalbir Sahdev is a resident of Belleville, Illinois, who at all times

relevant to this matter, was employed by Defendant Empire Comfort Systems, Inc. at its

Belleville, Illinois headquarters.

2.      Defendant Empire Comfort Systems, Inc. ("Empire") is an Illinois corporation

based in Belleville, Illinois. It manufactures and sells gas fireplace systems, space heaters and

outdoor grills.

1


EXHIBIT
A

3.     Defendant Brian H. Bauer is a Director on the Board of Empire and a resident of Belleville, Illinois.

4.     Defendant Pamela A. Bauer is a Director on the Board of Empire, Treasurer of Empire, and a resident of Belleville, Illinois.

5.     Empire is a wholly owned subsidiary of Defendant Empire Group, Inc., an Illinois corporation. Pamela A. Bauer has beneficial ownership of approximately 36% of its stock which is held by the Pamela A. Bauer Revocable Trust; Brian H. Bauer has beneficial ownership of approximately 30% of its stock which is held by Bauer, LLC; and the rest of the stock is owned by other Bauer family members or trusts set up for their benefit.

6.     Empire Group, Inc. is also the parent company of Defendant American Hearth Systems, Inc., an Illinois corporation; Defendant Empire Properties, Inc., an Illinois corporation; Defendant HearthRite, Inc., an Illinois corporation; and Defendant Skypark Airport Parking, LLC, a Missouri corporation registered to do business in Illinois. Each of these subsidiaries does business in Illinois.

7.     This action arises out of Empire's employment of Plaintiff, pursuant to an employment agreement entitled "Employment and Executive Supplemental Income Agreement of Dalbir Sahdev" ("Agreement"). A true and accurate copy of the Agreement is attached hereto as Exhibit A.

8.     The Agreement was entered into in Belleville, Illinois, and the actions complained of herein occurred in Belleville, Illinois.

9.     Plaintiff was employed by Empire from October 8, 2002 to February 27, 2009. Between March 2007 and the termination of his employment on February 27, 2009, Plaintiff was Empire's President and Chief Executive Officer.

10.     On September 13, 2007, Empire and Plaintiff entered into the Agreement, which formalized the terms and conditions of Plaintiff's continued employment and his eventual retirement from Empire.

11.     On September 13, 2007, Brian H. Bauer and Pamela A. Bauer personally, jointly and severally, guaranteed Empire's obligations under the Agreement in consideration for Plaintiff's continued employment by Empire.  The guarantee is provided for in Section XIII of the Agreement and states as follows:

> Brian H. Bauer and Pamela A Bauer ("Guarantors") personally guarantee the obligations of Employer hereunder. In the event of Employer's failure to perform any of Employer's obligations hereunder, upon thirty (30) days written notice of such failure to Employer and Employer's failure to cure and provide proof thereof to Employee within such thirty (30) day period, Employee may seek performance from either Guarantor without further action against Employer.  Guarantors shall also be, jointly and severally, responsible for any damages resulting from Employer's failure to perform Employer's obligation hereunder.

12.     Pursuant to Section V.E. of the Agreement, Plaintiff was afforded the option of terminating his employment and receiving substantial compensation and benefits described below, upon the occurrence of an event described as a "Triggering Event."

13.     Pursuant to Section V.E.6 of the Agreement, a Triggering Event that gives Plaintiff the option to terminate his employment is the failure of the company's Executive Team to give him unanimous support when an attempt is made to undermine his position or authority. Other Triggering Events described in Section V.E. include, but are not limited to, a change in Plaintiff's reporting responsibilities, such that Plaintiff no longer reports to the Executive Team;

a change in the number of persons reporting to Plaintiff resulting in Plaintiff having reduced management control and/or authority; and a change in the ownership structure of Empire or Empire Group, Inc.

14.     The Executive Team was comprised of Brian H. Bauer, Pamela A. Bauer and Plaintiff. On numerous occasions prior to the termination of Plaintiff's employment on February 27, 2009, the Executive Team failed to provide unanimous support to Plaintiff in situations where attempts were made, primarily by their son Nick Bauer, to undermine Plaintiff's position or authority.

15.     In or about July 2007, Empire hired twenty-two year old Nick Bauer, the son of Brian H. Bauer and Pamela A. Bauer, at their direction. Plaintiff created a position for him, Executive Associate, which reported directly to Plaintiff.

16.     Beginning in or about January 2008 and continuing through Plaintiff's termination, attempts were made by Nick Bauer to undermine Plaintiff's position and authority.

17.     Nick Bauer repeatedly disparaged Plaintiff and his management of Empire to Brian H. Bauer and Pamela A. Bauer, failing to first address his concerns with Plaintiff. His communications regarding Plaintiff were often disrespectful, crude and unprofessional and in form and content amounted to insubordination. These communications were made in an attempt to undermine Plaintiff's position and authority and the Executive Team failed to provide Plaintiff its unanimous support in response to these communications.

18.     In addition, Nick Bauer usurped Plaintiff's authority and undermined him as President and CEO by, among other things, overriding his legitimate directives to his direct reports and giving direction to Plaintiff's direct reports, without Plaintiff's knowledge or consent. The Executive Team failed to provide Plaintiff its unanimous support in response to these acts.

As a further consequence of these acts, the number of persons actually reporting to Plaintiff was in effect reduced, which in turn reduced his management control and authority.

19.     Nick Bauer functioned as a *de facto* member of the Executive Team by attending Executive Team meetings and by going directly to Brian H. Bauer and Pamela A. Bauer with his business proposals and strategies, bypassing Plaintiff, and at times seeking to override his decisions. These acts undermined Plaintiff's position and authority, and the Executive Team failed to provide Plaintiff its unanimous support in response to these acts. As a further consequence of these acts, Plaintiff no longer reported to the Executive Team as its composition is defined under the Agreement.

20.     Brian H. Bauer and Pamela A. Bauer failed to support Plaintiff in connection with these attempts to undermine his position and his authority. They permitted Nick Bauer to contact them directly, bypassing Plaintiff; authorized him to take actions that were rightfully the prerogative of Plaintiff as President and CEO of Empire, and that were on some occasions in contravention of Plaintiff's legitimate directives; and approved his proposals, bypassing Plaintiff, who was Nick Bauer's supervisor and the President and CEO of Empire. The failure of Brian H. Bauer and Pamela A. Bauer to provide unanimous support to Plaintiff when attempts were made to undermine his position and authority is a Triggering Event pursuant to Section V.E.6 of the Agreement. The acts which constitute those attempts and the failure of the Executive Team to provide unanimous support include but are not limited to, the following:

    a.     At Executive Team meetings which he attended with the approval of his parents, Nick Bauer interrupted discussions, provided unsolicited opinions, challenged decisions made by Plaintiff, and otherwise interfered with the functioning of the Executive Team. Plaintiff objected to his

attendance at these meetings, but Brian H. Bauer and Pamela A. Bauer continued to permit him to attend the meetings.  Eventually, Brian H. Bauer and Pamela A. Bauer began to discuss Executive Team matters directly with Nick Bauer outside Plaintiff's presence and without his knowledge or consent.

b.      In January or February 2008, Nick Bauer publically challenged Plaintiff at a meeting attended by the company's sales force.  Plaintiff announced the sales program and price discount changes for the 2008 season, including rebate multiplier rates for a product line called "Heaters" which had been unanimously approved by the Executive Team after strategic discussions. When the rebate multiplier rates were announced by Plaintiff at the annual sales meeting, Nick Bauer apparently disagreed with the announced rates. He stepped out of the meeting and called Brian H. Bauer who apparently approved Nick Bauer's preferred rebate multiplier rates during the phone call.  Nick Bauer came back into the meeting, and in the presence of Plaintiff and the entire sales force, announced that he had contacted Brian H. Bauer who had approved a different multiplier rate.  Pamela A. Bauer, who was present at the meeting, failed to support Plaintiff in the matter.

c.      In March 2008, Nick Bauer bypassed Plaintiff and forwarded a customer complaint concerning a reduction in a Live Burn Program payment amount to Brian H. Bauer and Pamela A. Bauer, stating, *"Shit we are dealing with everyday...that we try to address at the sales meeting that still gets changed."*  Brian H. Bauer and Pamela A. Bauer failed to support

Plaintiff by directing Nick Bauer to discuss the matter first with Plaintiff,

failed to make Plaintiff aware of the communication from Nick Bauer

so that he could address it with him, and did not themselves call the

customer complaint to Plaintiff's attention so that he might respond to it

directly.

d.    Between March and July 2008, Nick Bauer and Empire's Vice President

of Sales Management, Joe Brueggmann, circumvented Plaintiff and sought

and obtained approval from Brian H. Bauer and Pamela A. Bauer to

change the company's sales strategy for the promotion of the company's

Manthis fireplace line. The strategy of promoting the line in the western

half of the United States, possibly using a new sales force, and of using

unit product pricing for the line had been approved by the Executive Team

after careful discussion.  Nonetheless, Brian H. Bauer and Pamela A.

Bauer approved the proposal by Nick Bauer and Mr. Brueggmann to

instead promote the line in the eastern half of the United States using the

existing sales force and to use bundled product pricing without even

notifying Plaintiff of the proposed changes.  They also approved a change

in the approved advertising budget to do unplanned advertising for the line

in trade journals.  Brian H. Bauer and Pamela A. Bauer failed to direct

Nick Bauer or Joe Brueggmann to discuss the proposed strategy changes

with Plaintiff first; they did not make Plaintiff aware that the changes had

been proposed by Nick Bauer and Joe Brueggmann; and they did not

discuss any of the proposed strategy changes with Plaintiff. They failed

even to inform Plaintiff that they had authorized the changes.

e.    In or about May 2008, Nick Bauer bypassed Plaintiff and without

consultation with Plaintiff, presented a proposal to Brian H. Bauer and

Pamela A. Bauer regarding an offer of special pricing to a potential new

customer. The proposed special pricing offer had significant implications

related to profitability for the new customer's business, potential adverse

reactions from existing customers who were its competitors and would not

be extended the same terms, and required changes in engineering and

manufacturing operations. Brian H. Bauer and Pamela A. Bauer failed to

direct Nick Bauer to discuss the proposal with Plaintiff, and did not

themselves discuss the proposal with Plaintiff. Instead, they approved

exploration of the proposal. Exploration of the proposal required the time

and attention of other Empire employees, including persons who reported

to Plaintiff. Plaintiff learned about the proposal when he discovered that

Empire employees who reported to him were working on the matter.

f.    In or about July 2008, Pamela A. Bauer failed to provide support to

Plaintiff in response to a public attack against him by Joe Brueggmann.

The Executive Team had made a decision to give Joe Brueggmann

additional discretion to approve price concessions, provided he appeared

capable of doing so after working closely with Plaintiff for a month.

The Executive Team directed that Plaintiff and Joe Brueggmann meet to

8

go over price concession requests on a daily basis to make sure that the requests were addressed promptly. Following an e-mail from Plaintiff scheduling the daily meetings, Joe Brueggmann sent an e-mail to the entire sales force stating, *"Shackled! Just what I need more meetings and agendas. When will I get to do some work for you guys? I think I will just quit and get a 9-5 and have a life instead of this silly bullshit! Have a weekend, I won't."* Nick Bauer forwarded this e-mail to Pamela A. Bauer, who took no action to support Plaintiff in the face of this clear attempt to undermine him with the company's sales force.

g.   In or about July or August 2008, Nick Bauer bypassed Plaintiff and contacted Pamela A. Bauer to request that she override a credit limit that had been extended to a customer under company procedures that were Plaintiff's responsibility to administer. Pamela A. Bauer approved the override without consulting Plaintiff.

h.   In August 2008, Nick Bauer bypassed Plaintiff and contacted Brian H. Bauer and Pamela A. Bauer to criticize the way in which a customer's request for co-op funds had been handled by the company's customer service representative. Nick Bauer sent the customer's complaint to them with the message, *"I only send you this stuff because this is why sales are down...we don't put the customer first...We kill ourselves."* He closed by saying, *"Hell we turned down their cop-op because it was a few days late? Are you fucking kidding me? Is that customer driven????? I think I am going to drive back over there myself next week and fix this shit from*

*the bottom up.*" In part, Nick Bauer forwarded this complaint in an effort
to convince Brian H. Bauer and Pamela A. Bauer that they should permit
Joe Brueggmann to move his office closer to the customer service
department in order to be more involved in customer service matters, a
move Plaintiff opposed. Referring to an e-mail in which Joe Brueggmann
stated that incidents like this were why he needed to move his office, Nick
Bauer sent an e-mail to Brian H. Bauer and Pamela A. Bauer, saying, "*fyi,
we got to make a move. We do not have time to delay anymore.*" He went
on to say that customer service's response was "*pathetic*" and that "*this
was what the reps said was our problem.*" He closed by saying, "*We got
to fix it.*" Neither Brian H. Bauer nor Pamela A. Bauer Plaintiff forwarded
these e-mails to Plaintiff so that he might address them directly with Nick
Bauer who in theory worked under his supervision.

i.   In or about October 2008, Nick Bauer bypassed Plaintiff and contacted
Brian H. Bauer and Pamela A. Bauer in an effort to convince them to
reorganize the marketing department so that it reported to Vice President
of Sales Management, Joe Brueggmann, rather than to the Vice President
of Sales Administration, Ken Belding, and to fire Ken Belding, actions
opposed by Plaintiff. In an e-mail related to the subject, Nick Bauer said,
"*Who the hell do you think knows what sells? Ken and Jeff? Or our reps
who are selling every freaking day. We can NOT afford to make any
freaking mistakes right now. Dalbir is afraid to have Jeff report to Joe, so
now Jeff is going to report to Dalbir, which makes no sense. Pull the damn*

*trigger all the freaking way. I'm tired of this crap, it's so damn easy to fix and yet we make it more freaking difficult.*" Brian H. Bauer and Pamela A. Bauer failed to direct Nick Bauer to address these issues with Plaintiff; they did not make Plaintiff aware of this communication so that he could address it with Nick Bauer; and they did not call these issues to Plaintiff's attention in order that he could respond appropriately.

j.      In November 2008, Nick Bauer bypassed Plaintiff and provided information on a parts order problem to Brian H. Bauer and Pamela A. Bauer, blaming the problem on Plaintiff's decision to lay off his friend, Vicki Austin, who was a parts order entry clerk. In his e-mail to his parents about the matter, Nick Bauer says, "*Dalbir said, she is a bad worker anyway and we won't miss her. I guess that wasn't completely accurate.*" Brian H. Bauer responded that "*dss has a bad habit of saying things like this.*" Nick Bauer responded saying about Plaintiff, "*He has a bad habit of making decisions when he doesn't know what the fuck is going on. . . . You cannot have someone running your business who doesn't understand how it works, from top on down.*" Brian H. Bauer and Pamela A. Bauer failed to direct Nick Bauer to address these issues with Plaintiff; they did not make Plaintiff aware of this communication so that he could address it with Nick Bauer; they did not call these issues to Plaintiff's attention in order that he could respond appropriately; they failed to chastise Nick Bauer for his disrespectful and insubordinate comments, thereby encouraging him to continue to undermine Plaintiff;

11

and Brian H. Bauer's response to his son's e-mail demonstrated a lack of

support for Plaintiff in the face of an attempt to undermine him.

k.    In November 2008, Nick Bauer bypassed Plaintiff and submitted a two-

year plan for product development directly to Brian H. Bauer and Pamela

A. Bauer without even copying Plaintiff. Brian H. Bauer and Pamela A.

Bauer failed to direct Nick Bauer to address these issues with Plaintiff and

they did not make Plaintiff aware of this communication so that he could

address it with Nick Bauer.

l.    In November 2008, Nick Bauer bypassed Plaintiff and forwarded to Brian

H. Bauer and Pamela A. Bauer a complaint about the 2009 company

calendars. He commented, *"They look like hell,"* and again argued that the

marketing department should not report to the Vice President of Sales

Administration, Ken Belding, and that Ken Belding should be fired. Brian

H. Bauer and Pamela A. Bauer failed to direct Nick Bauer to address this

issue with Plaintiff; they did not make Plaintiff aware of this

communication so that he could address it with Nick Bauer; and they did

not call this issue to Plaintiff's attention in order that he could respond

appropriately.

m.    In or about December, 2008, Nick Bauer bypassed Plaintiff and obtained

the permission of Brian H. Bauer and Pamela A. Bauer to approve a

purchase order to buy product in the approximate amount of $140,000.

This act was in contravention of Empire's purchase order approval process

that required signatures of the controller, purchasing manager and Vice

President of Special Projects, as well as final approval by Plaintiff. Brian H. Bauer and Pamela A Bauer failed to discuss the deviation from procedures with Plaintiff; they did not make Plaintiff aware that Nick Bauer proposed to deviate from the procedures; and they did not discuss the proposed deviation with Plaintiff. They failed to even inform Plaintiff that they had authorized the deviation from procedures.

n.    In December 2008, Nick Bauer sent an e-mail to the Executive Team complaining that a price list for the 2009 season had prematurely been sent to customers, and demanding to know who had authorized it. Plaintiff responded saying that the mailing had gone out early due to a miscommunication, and that it was not Nick Bauer's place to take him to task over this, especially in the tone that Nick Bauer had used in his e-mail. Nick Bauer then e-mailed Brian H. Bauer and Pamela A. Bauer saying, "*its always something elses misunderstanding.*" He e-mailed Plaintiff, copying his parents, saying, "*I guess I'm just sick of fixing other peoples mistakes and seeing what once was a great business, my family business, being run into the ground.*" Brian H. Bauer and Pamela A. Bauer failed to support Plaintiff in response to Nick Bauer's disrespectful and insubordinate communications and failed to chastise Nick Bauer for the communications, thereby encouraging him to continue to undermine Plaintiff.

o.    In December 2008, Nick Bauer and Joe Brueggmann, with the approval of Brian H. Bauer and Pamela A. Bauer, hired Fred Cabler, placed him in a

13

newly created position called Regional Sales Manager and agreed that he would be compensated by payment of a salary. This act amounted to a significant change in the company's sales structure since it had a policy of selling through independent sales representatives. Plaintiff was not advised that there was a proposal under consideration to make a change in the company's sales structure, nor was he consulted about the hiring of Mr. Cabler, his title or his compensation.

p.    In late 2008, Nick Bauer, in collaboration with Joe Brueggmann, bypassed Plaintiff and went to Brian H. Bauer and Pamela A. Bauer with objections to the price increase recommendations Plaintiff had made for the 2009 season. Brian H. Bauer and Pamela A. Bauer failed to direct Nick Bauer and Joe Brueggmann to address these issues with Plaintiff; they did not make Plaintiff aware of these objections so that he could address them with Nick Bauer and Mr. Brueggmann; and they did not call these issues to Plaintiff's attention in order that he could respond appropriately.

q.    In January 2009, Plaintiff learned that Nick Bauer was planning a meeting with the company sales representatives, to which Plaintiff would not be invited, to ask them how each department in the company was performing and how the company's sales managers were performing. Plaintiff objected to holding such a meeting, only to learn that it had already been approved by Brian H. Bauer and Pamela A. Bauer. Brian H. Bauer and Pamela A. Bauer failed to direct Nick Bauer to address this issue with Plaintiff; they did not make Plaintiff aware of the proposed meeting so that

14

he could address it; they did not call the proposed meeting to Plaintiff's attention in order that he could respond appropriately; and they did not inform Plaintiff that they had approved the meeting.

r.     In January 2009, Plaintiff contacted Brian H. Bauer and Pamela A. Bauer on a confidential basis to express his concerns about the meeting and to object to having been bypassed on this and other occasions. He stated that this and other instances of being circumvented were undermining him and marginalizing his authority. Brian H. Bauer's response was that he could not understand why Plaintiff was objecting to either the meeting or anything else that had happened. Plaintiff's subsequent offer to explain his concerns to Brian H. Bauer and Pamela A. Bauer was forwarded to Nick Bauer. Nick Bauer took issue with Plaintiff's concerns in an e-mail to Brian H. Bauer and Pamela A. Bauer, concluding with the statement, *"I'm tired of worrying and dealing with this shit, I'm very happy we are having a family meeting Thursday cause I'm at my breaking point."* Brian H. Bauer and Pamela A. Bauer failed to advise Plaintiff that a meeting was to occur with Nick Bauer to which he  was not invited; rejected Plaintiff's concerns and request for support, pretending to be unaware of the incidents that lead to his request for an opportunity to discuss the problem of Nick Bauer's conduct; involved Nick Bauer in a confidential Executive Team matter; and failed to chastise Nick Bauer for his disrespectful and insubordinate comments, thereby encouraging him to continue to undermine Plaintiff.

s.   In January 2009, Nick Bauer again urged Brian H. Bauer and Pamela A. Bauer to fire Ken Belding, Vice President of Sales Administration, who had been with the company for twenty-two years.  His criticism of Ken Belding included the accusation that he had allowed Plaintiff to bully him into making decisions that were bad for the company.  Ignoring the fact that Plaintiff was the company's President and CEO, Nick Bauer stated, *"This type of selfishness I cannot have in my organization."*  Brian H. Bauer and Pamela A. Bauer failed to remind Nick Bauer that he was Plaintiff's subordinate or to chastise him for his disrespectful and insubordinate comments, thereby encouraging him to continue to undermine Plaintiff.

t.   In February 2009, Nick Bauer complained in an e-mail to Brian H. Bauer and Pamela A. Bauer, *"We have a President/CEO that cares more about his ego and getting what he wants then what is best for the company."*  Brian H. Bauer and Pamela A. Bauer failed to remind Nick Bauer that he was Plaintiff's subordinate or to chastise him for his disrespectful and insubordinate comments, thereby encouraging him to continue to undermine Plaintiff.

u.   In February 2009, Nick Bauer contacted Brian H. Bauer with a request that he be permitted to move into the office space formerly occupied by the company's previous CEO.  Brian H. Bauer approved the request knowing that Plaintiff had planned to move into that space.

v.  In February 2009, Plaintiff e-mailed Brian H. Bauer and Pamela A. Bauer,
requesting a face-to-face meeting with them to discuss his concern that he
was being undermined and that they were failing to provide him the
support guaranteed by the Agreement.  In response, Brian H. Bauer
questioned the need for a face-to-face meeting, proposing instead that they
discuss the matter by phone.  Brian H. Bauer and Pamela A. Bauer
forwarded the e-mail exchange to Nick Bauer, who commented to them by
e-mail, *"The reason why the phone isn't effective is because for 15 of the
last 20 years you had a strong leader that knew what he was doing and
didn't look to you two for guidance.  Now you have a president/ceo who
has no clue how to run this business and needs those answers from you."*
He said in conclusion, *"This is also the perfect chance to get Dalbir to
quit so he quits destroying this company."*  Brian H. Bauer responded to
Nick Bauer by e-mail, saying that he agreed with him.

w.  In February 2009, Plaintiff renewed his request for a face-to-face meeting
with Brian H. Bauer and Pamela A. Bauer, stating that he would provide
the requested examples at the meeting, and emphasizing that the meeting
was required to restore him to his proper role in the company.  In the same
e-mail, he addressed a number of other pressing business issues at Empire.
Brian H. Bauer and Pamela A. Bauer forwarded the e-mail to Nick Bauer
who responded with diatribe against Plaintiff.  In his message to his
parents, he claimed that Plaintiff had been unconcerned about sales in past
years and taken no responsibility for sales or engineering problems,

accused Plaintiff of wanting absolute control, *"without either of you two or myself involved"*, and stated that Plaintiff had failed miserably when he had been given control. He suggested that Plaintiff be encouraged to leave and *"quit ruining my family business"* and concluded by saying *"We made the mistake of making him the president, now we have the chance to fix it."* Brian H. Bauer and Pamela A. Bauer proceeded to have a private meeting with Nick Bauer, prior to the meeting that Plaintiff had requested. They failed to remind Nick Bauer that he was Plaintiff's subordinate or to chastise him for his disrespectful and insubordinate comments, thereby encouraging him to continue to undermine Plaintiff.

21.    The acts described above effectively relieved Plaintiff of two direct reports without his consent, resulting in reduced management control and authority. Effectively, Vice President of Product Development Nick Bauer reported to Brian H. Bauer and Pamela A. Bauer and not to Plaintiff. Effectively, Vice President of Sales Management Joe Brueggmann reported to Nick Bauer and not to Plaintiff. Thus, only four of the six Vice Presidents who ostensibly reported to Plaintiff, actually reported to him. This constitutes a change in the number of persons reporting to Plaintiff which results in his having reduced management control and authority, and is a Triggering Event pursuant to Section V.E.2 of the Agreement.

22.    The acts described above effectively changed the make-up of the company's Executive Team as defined in Section V.E. of the Agreement in that Nick Bauer became a *de facto* member of the Executive Team. This constitutes a change in Plaintiff's reporting responsibilities with employer such that he is no longer reporting to the Executive Team as defined in the Agreement, and is a Triggering Event pursuant to Section V.E.1 of the Agreement.

## COUNT I
### (Breach of Contract v. Empire Comfort Systems, Inc.)

Comes now Plaintiff, Dalbir Sahdev, by and through his attorneys, Donovan, Rose, Nester & Joley, P.C., and Mary Anne Sedey of Sedey Harper P.C. and for Count I of his complaint states as follows:

28.     Plaintiff re-alleges and incorporates paragraphs 1 through 27 by reference as if fully set forth herein.

29.     All conditions precedent having been satisfied, Empire was obliged to pay to Plaintiff the Deferred Benefit on or before April 28, 2009.

30.     Empire failed to pay Plaintiff the Deferred Benefit on or before April 28, 2009, and has been since that date in breach of the Agreement.  To date, Empire failed and refused to pay to Plaintiff the Deferred Benefit.

31.     Al conditions precedent having been satisfied, Empire was obliged to pay Plaintiff for his accrued but unused vacation within a reasonable time of the termination of his employment on February 27, 2009.

32.     Empire failed to pay Plaintiff for his accrued and unused vacation and is in breach of the Agreement.  To date, Empire has failed and refused to pay Plaintiff for his accrued and unused vacation.

33.     Plaintiff provided Empire written notice of its defaults by letter dated May 5, 2009 which was received by Empire on May 6, 2009.  To date, Empire has not cured its defaults by paying Plaintiff his Deferred Benefit and paying him his accrued but unused vacation.

34.     As a result thereof, Plaintiff has been required to institute legal action to recover for Defendant's breach and to enforce the Agreement.

35.   The Agreement provides in Section XI that when it becomes necessary for either party to institute a suit to enforce the Agreement, whichever party prevails in such suit shall be entitled to recover its reasonable attorneys' fees, court costs and expenses incurred in connection with such action.

WHEREFORE, Plaintiff prays for judgment in his favor and against Empire and for an Order which includes the following:

   a.   A finding that one or more Triggering Events have occurred;

   b.   A finding that Empire has defaulted on its obligation to pay the Deferred Benefit and the accrued but unused vacation and is in breach of the Agreement;

   c.   Judgment in the amount of $937,422;

   d.   Judgment for pre-judgment interest in an amount to be determined at trial;

   e.   Judgment for Plaintiff's reasonable attorneys' fees, court costs and expenses incurred in connection with bringing this action;

   f.   Such further relief as this Court deems just and proper.

## COUNT II
### (Breach of Guaranty v. Brian H. Bauer and Pamela A. Bauer)

Comes now Plaintiff, Dalbir Sahdev, by and through his attorneys, Donovan, Rose, Nester & Joley, P.C. and Mary Anne Sedey of Sedey Harper. P.C., and for Count II of his complaint states as follows:

36.    Plaintiff re-alleges and incorporates paragraphs 1 through 27 and 29 through 35 by reference as if fully set forth herein.

37.    By letters dated May 5, 2009 and received on May 6, 2009, Plaintiff provided Brian H. Bauer and Pamela A. Bauer written notice that Empire had defaulted on its obligation to pay Plaintiff the Deferred Benefit and other obligations under the Agreement, and that they would be personally obligated to both fulfill the obligation and take responsibility for damages arising out of the default if Empire did not cure its breach within thirty (30) days. It has been more than thirty (30) days since Empire received written notice of its failure to perform its obligation to pay the Deferred Benefit and Empire has not cured its breach of the Agreement.

38.    All conditions precedent having been satisfied, Brian H. Bauer is now obligated to perform Empire's obligation to pay the Deferred Benefit and the accrued but unused vacation to Plaintiff under the Agreement, and has failed to do so.

39.    All conditions precedent having been satisfied, Pamela A. Bauer is now obligated to perform Empire's obligation to pay the Deferred Benefit and the accrued but unused vacation to Plaintiff under the Agreement, and has failed to do so.

40.    All conditions precedent having been satisfied, Brian H. Bauer is now responsible for Plaintiff's damages resulting from Empire's breach of the Agreement.

41.    Al conditions precedent having been satisfied, Defendant Pamela A. Bauer is now responsible for Plaintiff's damages resulting from Empire's breach of the Agreement.

42.    As a direct result of Empire's failure to perform its obligation, Plaintiff has not been paid the Deferred Benefit or the accrued but unused vacation, and has been and will continue to be damaged.

WHEREFORE, Plaintiff prays for judgment in his favor and against Brian H. Bauer and Pamela A. Bauer, jointly and severally, and for an Order which includes the following:

a.  A finding that one or more Triggering Events have occurred;

b.  A finding that Empire has defaulted on its obligation to pay the Deferred Benefit and the accrued but unused vacation and is in breach of the Agreement;

c.  A finding that Brian H. Bauer and Pamela A. Bauer, as guarantors of the obligations of Empire under the Agreement, are jointly and severally liable for any breach of the Agreement by Empire;

d.  Judgment for damages in an amount to be determined at trial that includes but is not limited to the unpaid Deferred Benefit; the amount due as accrued but unused vacation; attorneys' fees, court costs and expenses; and such other damages as flow from Empire's breaches;

e.  Judgment for pre-judgment interest in an amount to be determined at trial; and,

g.  Such further relief as this Court deems just and proper.

## COUNT III
### (Declaratory Judgment v. Empire Comfort Systems, Inc., Empire Group, Inc., American Hearth Systems, Inc., Empire Properties, Inc., HearthRite, Inc. and Skypark Airport Parking, LLC)

Comes now Plaintiff, Dalbir Sahdev, by and through his attorneys, Donovan, Rose, Nester & Joley, P.C., and Mary Anne Sedey of Sedey Harper, P.C., and for Count III of his complaint states as follows:

43.     Plaintiff re-alleges and incorporates paragraphs 1 through 27, 29 through 35 and 37 through 43 by reference as if fully set forth herein.

44.     Empire's failure to pay to Plaintiff the Deferred Benefit and its failure to pay him for his the accrued but unused vacation are material breaches of the Agreement.

45.     Pursuant to Section VII, B.1 of the Agreement, Plaintiff is prohibited from directly or indirectly competing with Empire, Empire Group, Inc., American Hearth Systems, Inc., Empire Properties, Inc., HearthRite, Inc. or Skypark Airport Parking, LLC in any business activities in which they (collectively "Entities") are engaged. Pursuant to Section VII.B.2, Plaintiff may not directly or indirectly solicit, divert, take away or attempt to take away or interfere with any of the business connections, accounts, distributors, dealers, suppliers, sales representatives or customers of the Entities. The restrictive covenants bind Plaintiff during the period of his employment and continue for a period of three years thereafter.

46.     Empire's material breaches of the Agreement discharge Plaintiff's continuing obligations under the Agreement's restrictive covenants.

47.     An actual controversy exists between the Entities and the Plaintiff concerning Plaintiff's obligations under the Agreement in light of Empire's material breach, which controversy is ripe for judicial resolution by the Court.

WHEREFORE, Plaintiff requests that the Court make a judicial determination of the respective rights and duties of the Plaintiff and the Entities, and in particular requests that the Court issue an Order which includes the following:

a.     An Order declaring that Plaintiff has no further obligations under the restrictive covenants set forth in the Sections VII. B.1 and B.2 of the Agreement;

24

b.    Judgment for Plaintiff's reasonable attorneys' fees, court costs and

expenses incurred in bringing this action; and

c.    An Order for further relief as this Court deems just.

PLAINTIFF DEMANDS TRIAL BY JURY AS TO COUNTS I, II AND III.


SOWERS & WOLF. LLC
Attorneys for Plaintiff


By:    _____
Ferne P. Wolf, #6209237
530 Maryville Centre Dr., Suite 460
St. Louis, Missouri 63141
314-744-4010
fw@sowerswolf.com

25

# EMPLOYMENT AND EXECUTIVE SUPPLEMENTAL INCOME AGREEMENT
## OF
### DALBIR SAHDEV

This Employment and Executive Supplemental Income Agreement ("Agreement") is made effective as of the 13th day of September, 2007 ("Effective Date"), by and between Empire Comfort Systems, Inc., an Illinois corporation, with its principal place of business at 918 Freeburg Avenue, Belleville, Illinois 62222 (hereinafter referred to as "Employer") and Dalbir Sahdev, an individual of 19 Pinewood Lane, Fairview Heights, IL 62208 (hereinafter referred to as "Employee").

WHEREAS, Employer is organized and existing under the laws of Illinois;

WHEREAS, Employer has employed Employee for many years and Employee has been a loyal employee of Employer for many years;

WHEREAS, together, Employer and Employee desire to formalize the terms and conditions of Employee's continued employment with and eventual retirement from Employer;

WHEREAS, Employee and Employer hereby accept the terms and conditions of this Employment Agreement set forth below.

NOW, THEREFORE, for and in consideration of the mutual promises herein contained, the parties hereto agree as follows:

## SECTION I.    EMPLOYMENT RELATIONSHIP

Employer hereby employs Employee and Employee hereby accepts employment from Employer upon the terms and conditions herein set forth.

## SECTION II.    FULL TIME EMPLOYMENT

Employee shall well and faithfully serve Employer as the President and Chief Executive Officer to the utmost of Employee's ability, and shall do and perform all such services, acts and things connected herewith as the Board of Directors of Employer shall from time to time direct and are of a kind properly belonging to the duties of the President and Chief Executive Officer.

Employee shall not provide services to any other employer, either as employee or independent contractor during the Employment Period; provided, however, Employee does now and may from time to time serve as officer, director or manager of Employer's parent company, Empire Group, Inc. ("Parent") and Employer's sister companies, American Hearth Systems, Inc., Empire Properties, Inc., HearthRite, Inc. and Skypark Airport Parking, LLC ("Subsidiaries").

Employee shall devote Employee's entire time, attention and energies to the business of Employer, Parent and the Subsidiaries, and shall not during the term of this Agreement be engaged in any other

**EXHIBIT**

**A**

business activity whether or not such business activity is pursued for gain, profit or other pecuniary advantage; provided, however, that the foregoing restriction shall not be construed as preventing Employee from investing Employee's assets in such form or manner as will not require any significant services on the part of Employee and the direction of the affairs of the businesses in which such investments are made.

Employer and Employee shall mutually agree upon Employee's specific hours of service in advance. Notwithstanding the foregoing, Employee shall be available during regular business hours for telephone calls and other communications from Employer and shall promptly respond to all electronic mail correspondence or communications.

## SECTION III.   TERM OF EMPLOYMENT

The term of this Agreement shall commence on the Effective Date and shall terminate on September 13, 2017, unless otherwise terminated as hereinafter provided, or extended by mutual agreement of Employer and Employee (the "Employment Period").

## SECTION IV.   COMPENSATION AND BENEFITS

A.   **Compensation.**  During the Employment Period, Employer shall pay to Employee an annual salary payable once a calendar month and an annual bonus payable each year in an amount to be determined in the sole discretion of the Board of Directors of Employer from time to time (the annual salary and bonus collectively referred to as "Compensation").   As of the Effective Date, Employee's annual salary is $236,000.00.  Beginning November 1, 2007, Employee's annual salary shall be $295,000.00.  Any future adjustments to Employee's salary shall be approved by the Board of Directors of Employer.

B.   **Other Benefits.**  In addition to the Compensation provided above, Employer shall maintain certain benefits for Employee throughout the Employment Period.  For purposes of this Agreement, "Benefits" shall mean those benefits described in this Section IV.B.

1.   Employer shall provide for Employee family health insurance coverage. ("Family" shall include Employee's spouse and qualified children.)  This provision is subject to Employee's and Employee's family members' acceptance by the health insurance carrier through the insurance carrier's regular underwriting process.

2.   Employer shall reimburse Employee for all expenses incurred by Employee in furtherance of the Employer's business, including travel, lodging, and meals; provided, however, that the Employee must render to Employer a complete and accurate accounting of all such expenses incurred during any calendar month within fifteen (15) days of the close of such month.

3.   Employee shall be eligible to participate in any retirement plans or other qualified plans, including 401(k) plans and money purchase plans, that Employer may have from time to time subject to meeting the qualification criteria of such plans.

4.   Employer will provide Employee with additional retirement benefits under an executive supplemental income plan as set forth on Exhibit A attached hereto.

5.   Employer will provide Employee with Disability insurance benefits as set forth on Exhibit B attached hereto.

## SECTION V.   DEFERRED BENEFIT

A.   Definitions.

1.   "Deferred Benefit" shall mean an amount equal to three times the average annual Compensation paid to Employee pursuant to Section IV.A. above in the three (3) fiscal years immediately preceding the date of the termination of the Employment Period.

2.   "Terminated With Cause" shall mean Employer's termination or discharge of Employee from employment with Employer as the result or by reason of Employee's (1) willful disregard or neglect of, or material failure to comply with, the written or well established directives, policies or procedures of Employer, other than due to Employee's Disability or death, (2) engaging in grossly negligent, reckless, intentional or criminal conduct materially injurious to Employer or its business reputation (including, but not limited to, theft, embezzlement, or kickbacks), or (3) breach of any of the terms of this Agreement.

3.   "Terminated Without Cause" shall mean Employer's termination or discharge of Employee from employment with Employer for any reason other than (1) Employee's death, (2) Employee's Disability, or (3) Employee is Terminated With Cause.

4.   "Disability" shall be as defined in Northwest Mutual Life Insurance Company Disability Policy No. D1-699-136.

B.     Termination of Employment.

1.     Upon the termination of the Employment Period for any reason, all Compensation under Section IV.A. shall immediately cease and Employee shall receive only the Deferred Benefit described in this Section V, if applicable.

    a.     <u>Terminated Without Cause</u>. In the event the employment of Employee is Terminated Without Cause at any time during the Employment Period, then this Agreement shall automatically terminate (constituting a separation from service as defined by Internal Revenue Code Section 409A(a)(2)(A)(i)) and Employer shall pay to Employee the Deferred Benefit in one lump sum payment no later than sixty (60) days following the effective date of the termination.

    b.     <u>Terminated With Cause</u>. In the event the employment of Employee is Terminated With Cause at any time during the Employment Period, this Agreement shall automatically terminate and Employer shall have no further obligations hereunder and Employee shall not be entitled to any Deferred Benefit.

    c.     <u>Voluntary Resignation</u>. In the event the employment of Employee is terminated by Employee by voluntary resignation at any time, this Agreement shall automatically terminate and Employer shall have no further obligations hereunder and Employee shall not be entitled to any Deferred Benefit.

2.     Upon termination of the Employment Period for any reason, all Benefits under Section IV.B. shall cease, except as specifically provided in this Section V.

    a.     <u>Health Insurance</u>. The Benefits under Section IV.B.1. shall continue for the benefit of Employee and/or his family, as appropriate, until September 13, 2017, if the termination is as a result of Employee being Terminated Without Cause, Employee's death or Disability, or by election of Employee pursuant to Section V.E. For purposes of this Section V.B.2., Employer may provide such continuing health insurance coverage by payment of COBRA premiums on behalf of the insured or premiums on other third party provider coverage at similar levels as those maintained by Employer for its employees; provided, however, such coverage is subject to the insured's acceptance by the health insurance carrier and such premiums are limited to the amount of premiums Employer would be obligated to

pay under Employer's group plan had this Agreement not been terminated.

b.  Retirement Benefits. The Benefits under Section IV.B.3. to the extent of contributions which Employer would have made on behalf of Employee based upon Employee's compensation in the fiscal year prior to termination, shall continue for the benefit of Employee until September 13, 2017, if the termination is as a result of Employee being Terminated Without Cause.

c.  Supplemental Income. The Benefits under Section IV.B.4. shall continue for the benefit of Employee until September 13, 2017, if the termination is as a result of Employee being Terminated Without Cause, Employee's death or Disability or by election of Employee pursuant to Section V.E.

d.  Disability Insurance. The Benefits under Section IV.B.5. shall continue for the benefit of Employee for a period of one (1) year from the date of termination, if the termination is as a result of Employee being Terminated Without Cause, Employee's Disability or by election of Employee pursuant to Section V.E.

C.  **Death of Employee.** Except as provided in Section V.B.2., upon termination of this Agreement as a result of Employee's death, this Agreement shall automatically terminate and Employer shall have no further obligations hereunder and Employee shall not be entitled to any Deferred Benefit.

D.  **Disability of Employee.** Except as provided in Section V.B.2., upon termination of this Agreement as a result of Employee's Disability, this Agreement shall automatically terminate and Employer shall have no further obligations hereunder and Employee shall not be entitled to any Deferred Benefit.

E.  **Other Triggering Events.** Upon the occurrence of any of the following events during the Employment Period, Employee shall have the option of terminating this Agreement (which termination shall constitute a separation from service as defined by Section 409A(a)(2)(A)(i)):

1.  A change in Employee's reporting responsibilities with Employer, such that Employee is no longer reporting to the Executive Team;

2.  A change in the number of persons reporting to Employee which results in Employee having reduced management control or authority;

5

3.  A change in the officer positions held by Employee in Employer or Parent or any of its Subsidiaries which results in Employee having reduced management control or authority;

4.  Any sale of all or substantially all of the assets of Employer or a change in the ownership structure of Employer or Parent;

5.  A voluntary or involuntary filing by or on behalf of Employer for protection under the laws of the Federal Bankruptcy Code or its successor; or

6.  If Employee does not get unanimous support from the Executive Team when an attempt is made to undermine the position or authority of Employee.

7.  If Employer fails to make a payment due to Employee hereunder as provided in Section VIII.D hereof.

For purposes of this Agreement, Executive Team shall mean Brian H. Bauer, Pamela A. Bauer and Employee. If either Employee or Employer provides written notice to the other party within one-hundred eighty (180) days of the later of the occurrence of any of the foregoing events or receipt of knowledge of the occurrence of any such event, Employee shall have twelve (12) months from the date of receipt of the written notice to exercise the option granted herein. Upon termination of this Agreement by Employee pursuant to this Section V.E., this Agreement shall terminate and Employee shall be paid the Deferred Benefit in one lump sum within sixty (60) days of the effective date of the termination by Employee and Benefits shall continue as provided in Section V.B.2.

F.   **Claims Procedure.**

1.  The Named Fiduciary Administrator of this Agreement shall be Employer or as otherwise designated by the Board of Directors of Employer ("Administrator"). The Administrator shall be responsible for the management, interpretation, control and administration of this Agreement.

2.  If Employee or any successor in interest ("Claimant") believes that Claimant is being denied a benefit to which Claimant is entitled under this Agreement, Claimant may file a written request for such benefit with the Administrator setting forth Claimant's claim. The request must be addressed to Administrator at Employer's principal place of business.

3.  Upon receipt of a claim, Administrator shall advise the Claimant that a reply will be forthcoming within ninety (90) days and shall, in fact, deliver such reply within such period. Administrator may, however, extend the reply period for an additional ninety (90) days for reasonable cause.

6

4.   If the claim is denied in whole or in part, Administrator shall adopt a written opinion, using language calculated to be understood by the Claimant, setting forth: (i) the specific reason or reasons for such denial; (ii) the specific reference to pertinent provisions of this Agreement on which such denial is based; (iii) a description of any additional material or information necessary for the Claimant to perfect his or her claim and an explanation why such material or such information is necessary; and (iv) appropriate information as to the steps to be taken and time limits if the Claimant wishes to submit the claim for review.

5.   Within sixty (60) days after the receipt by the Claimant of the written opinion described above, the Claimant may appeal the denial of the original claim to Administrator. The Claimant or his duly authorized representative may, but need not, review the pertinent documents and submit issues and comments in writing for consideration by Administrator. If the Claimant does not request a review of Administrator's determination by Administrator within such sixty (60) day period, the Claimant shall be barred from challenging Administrator's determination.

6.   Within sixty (60) days after Administrator's receipt of a request for review, Administrator will review the denial of the original claim. After considering all materials presented by the Claimant, Administrator will render a second written opinion, written in a manner calculated to be understood by the Claimant, setting forth the specific references to the pertinent provisions of this Agreement on which the decision is based. If special circumstances require that the sixty (60) day time period be extended, Administrator will so notify the Claimant and will render the decision as soon as possible, but no later than one hundred twenty (120) days after receipt of the request for review.

G.   **Additional Terms.**

1.   Notwithstanding anything to the contrary herein, Employer shall have no obligation to set aside, earmark or entrust any fund or money with which to pay its obligations under this Agreement. Employee or any successor in interest shall be and remain simply a general creditor of Employer in the same manner as any other creditor having a general claim for matured and unpaid compensation.

2.   Employer reserves the absolute right at its sole discretion to either fund the obligations undertaken by this Agreement or to refrain from funding the same and to determine the extent, nature and method of such funding.

3.   No provision of this Agreement shall be deemed to create any specific rights of employment to Employee or limit the right of Employer to terminate

Employee's employment with or without cause at any time.  Likewise, no provision of this Agreement shall limit Employee's right to voluntarily sever Employee's employment with Employer at any time.

4. Employer shall have the right to deduct from the Deferred Benefit paid, any federal, state, local, or employment taxes, which it deems are required by law to be withheld with respect to such payments.  At the request of Employee, or as required by law, such sums as may be required for the payment of any estimated or accrued income tax liability may be withheld and paid over to the governmental entity entitled to receive the same.  Employee shall be solely responsible for any income taxes or other tax liability resulting from the Deferred Benefit provided under this Agreement.

5. It is the intention of the parties hereto that this Agreement, to the extent allowed, be exempt from the Employee Retirement Income Security Act of 1974 ("ERISA") due to it constituting an unfunded arrangement maintained by an employer for a select group of management or a highly compensated employee.  This Agreement is intended to be classified under what is commonly known as the "Top-Hat" exemption available under the provisions of ERISA.  Therefore, Employee and Administrator shall interpret and operate this Agreement in accordance with this intention.

6. Notwithstanding anything contrary herein, it is the intention of Employer to comply with the provisions of Section 409A of the Internal Revenue Code of 1986 (including regulations thereunder) or any successor statute, and thereby any provision of this Agreement that is in conflict with or violates the provisions of Section 409A shall be amended, modified, deleted or interpreted to the extent necessary to effect compliance with the terms of Section 409A as determined in the sole discretion of Employer upon advice and consultation of its attorney.

7. Employer does not represent or guarantee that any particular federal or state income, payroll, personal property, or other tax consequence will result from participation in this Agreement.  Employee should consult with professional tax advisors to determine the tax consequences of his participation.

8. Neither Employee, nor any successor in interest under this Agreement shall have any power or right to transfer, assign, anticipate, hypothecate, mortgage, commute, modify or otherwise encumber in advance Deferred Benefit payable hereunder, nor shall said Deferred Benefit be subject to seizure for the payment of any debts, judgments, alimony or separate maintenance owed by Employee, or any successor in interest, nor shall Deferred Benefit be transferable by operation of law in the event of bankruptcy, insolvency or otherwise.  In the event Employee, or any successor in interest, attempts assignment, commutation, hypothecation, transfer or disposal of the Deferred

Benefit, Employer's obligations hereunder shall forthwith cease and terminate.

9. The obligation of Employer to make payment of the Deferred Benefit shall be subject to all applicable laws, rules and regulations and to such approvals by any government agencies as may be deemed necessary or appropriate by the Employer.

10. It is agreed by and between the parties hereto that, during the lifetime of Employee, this Agreement may be amended or revoked at any time or times, in whole or in part, by the mutual written consent of Employee and Employer.

## SECTION VI.   VACATION

1. Employee shall be entitled to four (4) weeks of vacation per year during the Employment Period.

2. The Compensation and Benefits of Sections IV.A. and B. shall be applied in the same manner during periods of vacation.

3. At the end of a calendar year of employment and at the termination of the Employment Period, Employee shall be compensated for any accrued but unused vacation.

## SECTION VII.   CONFIDENTIALITY AND NON-COMPETITION

A. **Definitions.** As used in this Section VII:

1. "Confidential Information" shall mean information disclosed or made available to Employee or known by Employee as a consequence of or through Employee's employment by Employer, not generally known in the industry in which Employer is or may become engaged, and related to the manufacture or sale of gas heaters, hearth products or other gas heating appliances, grills, or any accessories related thereto, including, but not limited to, Proprietary Information (as defined in Section VII.A.2. hereinbelow) and information relating to research, development, manufacturing, purchasing, accounting, engineering, marketing, merchandising, or selling of such products.

2. "Proprietary Information" shall mean discoveries, concepts, and ideas, whether patentable or not, related to the manufacture or sale of gas heaters, hearth products or other gas heating appliances, grills, or any accessories related thereto, including but not limited to, products, structures, processes, methods, formulae, techniques, and improvements to the foregoing or to know-how.

9

B.   **Restrictive Covenants/Right to Proprietary Information.**   For and in consideration of the employment during the Employment Period and the Compensation and Benefits contained in Section IV. hereof, the sufficiency of which is hereby acknowledged, Employee hereby covenants and agrees that, during the Employment Period and for the period defined in Section VII.C., below, Employee will not, either directly or indirectly:

    1.   Compete with Employer, Parent or Parent's Subsidiaries or engage in any business activities in which Employer, Parent or Parent's Subsidiaries is engaged, from time to time, consisting of those business activities related to the manufacture or sale of gas heaters, hearth products or other gas heating appliances, grills, or any accessories related thereto, within the United States of America. Without limiting the generality of the foregoing, Employee shall not own, manage, operate, control, be employed by or participate in the ownership, management, operation or control of, or be connected in any manner with, any business or entity which competes in any way with the above-referenced business conducted by the Employer, Parent or Parent's Subsidiaries during the Employment Period and during any period in which the restrictive covenants of this Section VII are in force.

    2.   Solicit, divert, take away or attempt to take away or interfere with any of the business connections, accounts, distributors, dealers, suppliers, sales representatives, or customers of the Employer, Parent or Parent's Subsidiaries existing on or prior to the date hereof or which may thereafter be developed by the Employer during the Employment Period.

    3.   Disclose or communicate to anyone any trade secret, customer list, client list or other Confidential Information (as defined in Section VII.A.1) or any Proprietary Information (as defined in Section VII.A.2) relating to the business conducted by the Employer or make use of any such information for Employee's own benefit or for the benefit of any other person or entity.

C.   **Term.**   The restrictive covenants of this Section VII shall be binding on the Employee through the Employment Period and continuing for a period of three (3) years thereafter.

D.   **Tolling Period.**   In the event Employee is found by a court of competent jurisdiction or by a panel of arbitrators, as the case may be, to have violated the terms of this Section VII, the foregoing period shall be tolled for any period(s) of violation thereof, and such tolled period(s) shall extend from the date such finding or order becomes final.

E.   **Reasonableness of Restrictions.**   Employee expressly acknowledges the reasonableness of the restrictive covenants contained in this Agreement and the

10

adequacy of the consideration being paid for said covenants. If any restriction is nevertheless found by a court of competent jurisdiction to be unreasonable, that court may reduce the restriction in scope so as to render the restriction reasonable and shall enforce such restriction as so reduced.

F.   **Severability.** If any provision of this Section is declared void, such provision shall be deemed severed from this Section, which shall otherwise remain in full force and effect.

G.   **Arbitration.** Any dispute or controversy arising from or relating to this Section VII may be decided by arbitration in the City of Belleville, Illinois, by a panel of three arbitrators mutually acceptable to Employee and Employer. At the request of either Employer or Employee, arbitration proceedings will be conducted in secrecy; in such case, all documents, testimony, and records shall be received, heard and maintained by the arbitrators in secrecy, available for inspection only by Employer, Employee and their respective attorneys and experts who shall agree, in advance and in writing, to receive all such information confidentially and to maintain such information in secrecy until such information shall become generally known or until such time as such information becomes known by reason of judicial appeal from or enforcement of the decision of the arbitration.

H.   **Remedies.** Employee acknowledges that (i) the restrictions contained in this Section VII are reasonable and necessary in order to protect Employer's legitimate business interests; (ii) any violation thereof may result in irreparable injury to Employer; and (iii) the enforcement of a remedy by way of injunction would not prevent Employee from earning a living during the period of this restrictive covenant. Employee, therefore, acknowledges that, in the event of any violation hereof, Employer shall be authorized and entitled to seek in addition to or in lieu of arbitration as referenced in Section VII. G. hereinabove, from any court of competent jurisdiction (i) a temporary restraining order and/or preliminary and permanent injunctive relief, (ii) an equitable accounting of all profits or benefits arising out of such violation, and (iii) direct, incidental, consequential and punitive damages arising from the breach. Such rights or remedies shall be cumulative and in addition to any other rights or remedies to which Employer may be entitled in this Section VII or in the remaining provisions of this Agreement. In the event a bond is required in relation to an action to enforce this Agreement, the parties agree that a bond in the amount of One Thousand Dollars ($1,000.00) shall be sufficient.

## SECTION VIII.  TERMINATION

In the event of termination under this Section VIII, Employee shall be entitled to only the Deferred Benefit as described in Section V, if any.

A.   Employee may be Terminated Without Cause at any time upon Employer giving thirty (30) days written notice to Employee.

B. Employee may be Terminated With Cause, as determined in Employer's sole discretion, immediately upon written notice from Employer to Employee.

C. Further, this Agreement may be terminated in the sole discretion of the Employer in the event the Employee suffers a Disability (as provided in Section V.A.4.). Notwithstanding the foregoing, Employee may terminate this Agreement in the event that Employee has suffered a Disability, although not a Disability (as defined herein), and Employee has determined that Employee is medically unable to perform his duties hereunder.

D. This Agreement may be terminated by Employee, upon thirty (30) days written notice to Employer, if Employer fails to make a payment due to Employee hereunder and Employer fails to make such payment within the thirty (30) day notice period.

E. The Agreement shall terminate immediately upon the death of the Employee.

F. This Agreement may be terminated as provided under Section V.E.

## SECTION IX.   NOTICE

Any notice required under this Agreement shall be personally delivered or mailed via the U.S. Postal Service to Employer at Employer's principal place of business provided above and to Employee at the address provided above, or such other address for either party as is stated in written notice of address change given in compliance with this Section IX.

## SECTION X.   SEVERABILITY

If any provision of this Agreement is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable, that provision shall be deemed severable and the Agreement may be enforced with that provision severed or as modified by the Court.

## SECTION XI.   ATTORNEY'S FEES

In the event it becomes necessary for either party hereto to institute a suit at law or in equity for the purpose of enforcing any provisions of this Agreement, whichever party prevails in such suit shall be entitled to recover from the other party all reasonable attorney's fees plus court costs and expenses incurred in connection with such action.

## SECTION XII.   MISCELLANEOUS

A. This Agreement shall be construed in accordance with the laws of the State of Illinois. Each party hereto consents to personal jurisdiction in the courts of St. Clair County, Illinois.

B.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their representative heirs, personal representatives, successors, assigns and any of Employer's present or future subsidiaries, or organizations controlled by, controlling or under common control with it.

C.   Employee shall have no right to assign or delegate any of Employee's duties hereunder.

D.   This Agreement sets forth the entire understanding of the parties. No amendment or modification of the terms of this Agreement shall be valid unless made in writing and signed by Employee and a duly authorized representative of Employer.

E.   No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver by any party of any right, power or privilege hereunder preclude such party from thereafter enforcing strict compliance with any and all terms of this Agreement.

F.   The headings herein are for purposes of identification only and shall not be considered part of, or used in construing this contract.

## SECTION XIII.   GUARANTY.

Brian H. Bauer and Pamela A. Bauer ("Guarantors") personally guarantee the obligations of Employer hereunder. In the event of Employer's failure to perform any of Employer's obligations hereunder, upon thirty (30) days written notice of such failure to Employer and Employer's failure to cure and provide proof thereof to Employee within such thirty (30) day period, Employee may seek performance from either Guarantor without further action against Employer. Guarantors shall also be, jointly and severally, responsible for any damages resulting from Employer's failure to perform Employer's obligation hereunder.

*[signature page follows]*

IN WITNESS WHEREOF, the Parties hereto have executed duplicate counterparts of this Agreement as of the day and year first written above.

EMPLOYER:
EMPIRE COMFORT SYSTEMS, INC.

By: _____

Name: Brian H. Bauer
Title: Co-Chairman
Date: _12/28/07_

EMPLOYEE:

_____
Dalbir Sahdev
Date: _12/28/07_

GUARANTORS:

_____
Brian H. Bauer
Date: _12/28/07_

_____
Pamela A. Bauer
Date: _12/28/07_

Exhibit A

## Supplemental Income Plan

A.    Subject to the terms of this Agreement, Employer will pay to Employee the sum of One Million Dollars ($1,000,000.00) on September 13, 2017.

B.    In the event of Employee's Disability (as defined in Northwestern Mutual Life Insurance Company Policy No. 17-986-144) during the term of employment, Employer will pay to Employee the sum of One Million Dollars ($1,000,000.00) on September 13, 2017.

C.    In the event of Employee's death during the terms of this Agreement, Employer shall pay to Employee, his estate, or designated beneficiary (such designation to be submitted in writing by Employee to Employer in form as set forth in Exhibit C attached hereto), the sum of One Million Dollars ($1,000,000.00) within one hundred eighty (180) days of Employee's death.

Employer will maintain Northwestern Mutual Life Insurance Company Policy No. NML 17-986-144 during the term of this Agreement, and subject to the contingencies and conditions herein, in order to ensure available funds and funding of Employer's obligations for those benefits referenced under Section IV.B.4 of the Agreement.

Exhibit B

Disability Insurance Benefits

Those Disability Insurance Benefits referenced in Section IV.B.5 of the Agreement are as set forth in Northwestern Mutual Life Insurance Company Disability Income Policy No. D1-699-136.

IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL CIRCUIT
ST. CLAIR COUNTY, ILLINOIS

DALBIR SAHDEV,                          )
                                        )
    Plaintiff,                      )
                                        )
                                        )        No.   09-L___55 7
                                        )
vs.                                     )
                                        )
EMPIRE COMFORT SYSTEMS, INC.,           )
BRIAN H. BAUER,                         )
PAMELA A. BAUER,                        )
EMPIRE GROUP, INC.,                     )
AMERICAN HEARTH SYSTEMS, INC.,          )
EMPIRE PROPERTIES, INC.,                )
HEARTHRITE, INC. and                    )
SKYPARK AIRPORT PARKING, LLC,           )
                                        )
    Defendants.                     )

FILED
ST. CLAIR COUNTY
OCT 1 6 2009
CIRCUIT CLERK

## DEMAND FOR TRIAL BY JURY

Comes now Plaintiff, Dalbir Sahdev, by his attorney, Ferne P. Wolf of Sowers & Wolf

LLC, and in the above action demands a trial by jury as to all counts.

SOWERS & WOLF. LLC
Attorneys for Plaintiff

By: _____
Ferne P. Wolf, #6209257
530 Maryville Centre Dr., Suite 460
St. Louis, Missouri 63141
314-744-4010
fw@sowerswolf.com